# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2024 CA 0357

## CHARLES STRICKER

### VERSUS

## THE GREATER NEW ORLEANS EXPRESSWAY COMMISSION, AMY JONES, TRISTAN THOMPSON, CHRISTIAN COYLE, AND AIX SPECIALTY INSURANCE COMPANY

*Judgment Rendered:* NOV 2 2 2024

********

22st Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Case No. 2020-13451

The Honorable Ellen M. Creel, Judge Presiding

********

| | |
|---|---|
| David A. Strauss<br>Marco J. Salgado<br>Rachel M. Anderson<br>New Orleans, Louisiana | Counsel for Plaintiff/Appellant<br>Charles Stricker |
| Karen McInnis<br>Mandeville, Louisiana | |
| Craig R. Watson<br>Bert J. Miller<br>Metairie, Louisiana | Counsel for Defendants/Appellees<br>Greater New Orleans Expressway<br>Commission, Tristan Thompson,<br>and AIX Specialty Insurance<br>Company |

********

BEFORE: McCLENDON, WELCH, AND LANIER, JJ.

McClendon, J. concurs in the result reached by the majority.

Welch J., concurs in result

**LANIER, J.**

In this case where cross motions for summary judgment were filed, plaintiff challenges the trial court's judgment, granting defendants' summary judgment and dismissing his claims with prejudice. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On the morning of August 15, 2019, plaintiff, Charles Stricker, entered the North Toll Plaza of the Lake Pontchartrain Causeway ("Causeway") in a 2001 Toyota 4Runner towing an open utility trailer. Mr. Stricker paid his toll and proceeded onto the southbound lane of the Causeway. At the same time, Curtis Stansbury was also traveling southbound on the Causeway in a 2014 GMC Terrain. An accident occurred when Mr. Stansbury struck the rear of the utility trailer being pulled by Mr. Stricker's vehicle. Following impact, Mr. Stricker lost control of his vehicle, causing the vehicle and utility trailer to overturn, landing on the driver's side facing the North Shore. Mr. Stansbury's vehicle was pinned between the left curb and Mr. Stricker's vehicle. When Sergeant Tristan Thomas of the Causeway Police arrived at the scene, Mr. Stansbury still had his foot on the gas pedal. Sergeant Thomas put the vehicle in park and turned the vehicle off. He attempted to speak with Mr. Stansbury, who was incoherent and unsure of his location or what had taken place. When EMS arrived on the scene, Mr. Stansbury's blood sugar was 33, and the paramedics gave him glucose to elevate his sugar levels.

As a result of the damages sustained in this accident, Mr. Stricker brought suit against multiple defendants - the Greater New Orleans Expressway Commission ("the Causeway Commission"); AIX Specialty Insurance Company, in its capacity as liability insurer of the Causeway Commission ("AIX"); the State of Louisiana, through the Department of Transportation and Development ("DOTD"); Amy Jones (a toll booth operator employed by the Causeway Commission); and Officer Christian Coyle and Sergeant Tristan Thomas

2

(employees of the Causeway Police Department, a department of the Causeway Commission). Mr. Stricker claimed the accident was caused by the negligence and/or gross negligence of Ms. Jones, Officer Coyle, and Sergeant Thomas, and that the Causeway Commission was vicariously liable for their actions as its employees. He further claimed the Causeway Commission and DOTD were negligent and/or grossly negligent in causing the accident.

In his petition, Mr. Stricker alleged that the Causeway Commission and Ms. Jones had constructive knowledge of Mr. Stansbury's condition and failed to "prevent" him from driving his vehicle forward onto the Causeway. Mr. Stricker further asserted that the Causeway Commission and its employees failed to take safety measures, failed to close the North Toll Plaza, failed to warn the motorists already on the bridge, and failed to follow procedures for impaired motorists. Following a motion for partial dismissal filed by Mr. Stricker, all claims against DOTD were dismissed without prejudice. Moreover, Mr. Stricker withheld service on Ms. Jones and Officer Coyle. Thus, this appeal only deals with the claims against the Causeway Commission, AIX, and Sergeant Thomas (collectively "defendants").

Defendants answered Mr. Stricker's petition, asserting general denials. Defendants also raised several affirmative defenses, including: the alleged injuries and damages were caused by the acts or omissions of persons whom defendants did not control; the alleged injuries and damages were caused by Mr. Stricker's own contributory negligence; Mr. Stricker failed to mitigate his damages; Mr. Stricker's claims were barred by the doctrines of laches, waiver and/or estoppel; and the defense of discretionary act immunity in accordance with La. R.S. 9:2798.1.

Pertinent to this appeal, the parties filed cross motions for summary judgment. Defendants sought summary judgment, seeking dismissal of all of Mr.

3

Stricker's claims against them. Defendants alleged that the evidence unequivocally showed that the accident in question did not occur due to a violation of any alleged legal duty owed by the Causeway Commission or any of its employees. They further argued that any legal duty owed was met with reasonable actions of the toll operators and that there was no evidence that any action or inaction of the Causeway Commission in these circumstances could have or would have prevented the accident from happening. Finally, defendants asserted that the discretionary decisions of the Causeway Police Department relative to where to station its resources and police units and how to address a toll violator all fall under the discretionary immunity set forth in La. R.S. 9:2798.1.

In his cross motion for partial summary judgment on liability, Mr. Stricker alleged that the Causeway Commission made a promise to the public that its employees would monitor drivers and vehicles as they entered the causeway through the North Toll Plaza and that promise created a binding legal duty upon the Causeway Commission and its employees. Mr. Stricker further asserted that the Causeway Commission could not escape liability because the duty was breached.

Following a hearing, the trial court signed a judgment on October 26, 2023, granting defendants' motion for summary judgment, denying Mr. Stricker's cross motion for summary judgment, and dismissing, with prejudice, all of Mr. Stricker's claims against defendants. This appeal by Mr. Stricker followed.

## APPLICABLE LAW

Summary judgment procedure[1] is favored and "is designed to secure the just, speedy, and inexpensive determination of every action .... and shall be construed to accomplish these ends." La. Code Civ. P. art. 966(A)(2). An appellate court

---

[1] We note that the motions for summary judgment at issue in this appeal were filed under La. Code Civ. P. art. 966 prior to its amendment by 2023 La. Acts No. 317, § 1, and 2023 La. Acts No. 368, § 1, which became effective on August 1, 2023.

reviews the grant or denial of summary judgment *de novo* under the same criteria governing the trial court's consideration of whether summary judgment is appropriate. **Short v. RaceTrac Petroleum, Inc.**, 2022-0859 (La. App. 1 Cir. 2/24/23), 361 So.3d 1051, 1058, <u>writ denied</u>, 2023-00535 (La. 6/7/23), 361 So.3d 973. A court shall grant a motion for summary judgment if the motion, memorandum, and admissible supporting documents show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. <u>See</u> La. Code Civ. P. art. 966(A)(3) and (4). The summary judgment movant maintains the burden of proof. La. Code Civ. P. art. 966(D)(1). Nevertheless, if the movant will not bear the burden of proof at trial on the issue before the court on the motion, his burden is satisfied by pointing out an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, the adverse party must produce factual support sufficient to establish he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and, if appropriate, the court shall render summary judgment against him. <u>See</u> La. Code Civ. P. arts. 966(D)(1) and 967(B).

Where there are cross motions for summary judgment raising the same issues, this court can review the interlocutory denial of a summary judgment in addressing the appeal of the grant of a cross motion for summary judgment. **Huggins v. Amtrust Insurance Company of Kansas, Inc.**, 2020-0516 (La. App. 1 Cir. 12/30/20), 319 So.3d 362, 365. In this case, the parties' cross motions for summary judgment raise the same basic issue, *i.e.*, whether the Causeway Commission owes a duty to monitor every vehicle that crosses the North Toll Plaza for safety and driver impairment and to prevent any accident that may occur. Thus, this court will review the denial of Mr. Stricker's motion for partial summary judgment in addressing his appeal of the grant of defendants' motion for summary

5

judgment. See **McDonald v. D'Amico**, 2023-0884 (La. App. 1 Cir. 3/22/24), 385 So.3d 1162, 1166, writ denied, 2024-00444 (La. 6/19/24), 386 So.3d 674.

Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. **Chapman v. Haynes**, 2022-0288 (La. App. 1 Cir. 9/16/22), 352 So.3d 1023, 1027. Mr. Stricker's claims against defendants are based on negligence and are subject to a duty/risk analysis. See **Lafayette Steel Erector, Inc. v. G. Kendrick, LLC**, 2022-0895 (La. App. 1 Cir. 8/30/23), 375 So.3d 507, 514, writ denied, 2023-01322 (La. 12/19/23), 375 So.3d 415. For liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of his injuries (the cause in fact element); (4) the defendant's substandard conduct was a legal cause of his injuries (the scope of duty element); and, (5) proof of actual damages (the damages element). **Farrell v. Circle K Stores, Inc.**, 2022-00849 (La. 3/17/23), 359 So.3d 467, 473. A negative answer to any of the inquiries of the duty/risk analysis results in a determination of no liability. **Landers v. USIC Locating Services., Inc.**, 2020-0890 (La. App. 1 Cir. 4/26/21), 324 So.3d 1070, 1073-1074.

A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. **Ponceti v. First Lake Properties, Inc.**, 2011-2711 (La. 7/2/12), 93 So.3d 1251, 1252. A duty is defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." **Perkins v. Entergy Corp.**, 98-2081 (La. App. 1 Cir. 12/28/99), 756 So.2d 388, 403 (citing **Morris v. Orleans Parish School Board**, 553 So.2d 427, 429 (La. 1989)). The existence of a duty is a question of law. **Farrell**, 359

So.3d at 473. Specific duties can arise from codal, statutory, administrative and local laws, as well as private contracts and custom. **Doe v. McKesson**, 2021-00929 (La. 3/25/22), 339 So.3d 524, 537 n.1 (Weimer, C.J., concurring); **Martin v. ISC Constructors, L.L.C.**, 2023-0707 (La. App. 1 Cir. 3/13/24), 387 So.3d 630, 635-636. When no factual dispute exists and no credibility determinations are required, the legal question of the existence of a duty is appropriately addressed by summary judgment. **Listach v. West Baton Rouge Parish School Board**, 2021-0079 (La. App. 1 Cir. 6/9/21), 328 So.3d 450, 456, writ denied, 2021-00982 (La. 11/3/21), 326 So.3d 887.

## DISCUSSION

On appeal, Mr. Stricker raised numerous assignments of error with respect to the trial court's judgment, one of which was the trial court's failure to find that defendants owed a duty to the public to monitor drivers and vehicles before they enter the Causeway. Mr. Stricker maintains that the duty does not arise from statutory law or Louisiana jurisprudence, but rather "is an assumed duty based on the voluntary public representations" and rules the Causeway Commission "imposed on all drivers entering the Causeway." Pointing to the "toll plaza rules" found on the Causeway Commission's website, Mr. Stricker argues further that the public could reasonably believe that the Causeway Commission had the authority to enact said rules given its statutorily imparted police powers.

At trial, Mr. Stricker would bear the burden of proving the elements of his claims against defendants. Thus, for defendants to prevail on summary judgment, they were required to point out to the court the absence of factual support for any of the elements of Mr. Stricker's cause of action. See La. Code Civ. P. art. 966(D)(1). Defendants' motion for summary judgment focused on the duty element of the duty/risk analysis. Defendants argued that the accident did not occur due to a violation of any alleged duty owed by the Causeway Commission.

7

They further noted that any duty owed was met with reasonable actions by the Causeway Commission employees.

Mr. Stricker argued that defendants cannot escape the clear theory of liability based on their assumed duty to keep the Causeway safe by monitoring traffic. In opposing defendants' motion for summary judgment, Mr. Stricker alleged that whether the law would have inherently imposed the duty to monitor traffic entering the Causeway is irrelevant because defendants assumed that duty through their own public representations on a public website.

In support of their motion for summary judgment, defendants submitted a copy of Mr. Stricker's petition, as well as deposition excerpts of several witnesses. According to the testimony of Ms. Jones, she, and toll booth operators Michelle Booker and Winifred Ordone were working toll lanes 1, 3, and 2, respectively. Ms. Booker stated she noticed Mr. Stansbury stopped at the end of lane 3. Although she waved for Mr. Stansbury to move forward, he never did. Ms. Booker and Ms. Ordone had a conversation about the vehicle after which Ms. Ordone exited her toll booth and began walking towards Mr. Stansbury's vehicle.[2] As Ms. Ordone approached the vehicle, Mr. Stansbury never acknowledged her. Ms. Ordone noted that although the driver's side window was rolled up, she was able to observe an older white male with white hair through window. Ms. Ordone indicated that based on where Mr. Stansbury was stopped in the lane, the gate for lane 3 would have hit his car if Ms. Booker had activated the gate. Moreover, although Mr. Stansbury never made eye contact with Ms. Ordone, she stated that he appeared normal and that his eyes were open.

According to Ms. Ordone, she was prepared to knock on the window when Mr. Stansbury slowly drove forward. Based on his speed, Ms. Ordone believed he

---

[2] Ms. Ordone indicated that her lane was a tag only lane, whereas Ms. Booker was in a cash or tag lane. According to the record, the toll booth operators are trained not to leave their booths if they are in a cash lane.

was going to stop at the toll booth. Ms. Ordone then watched as Mr. Stansbury drove through lane 3, failing to stop at the toll booth and failing to yield to the commands of the toll booth operators who were yelling for him to stop. The lane violation occurred at 9:07 am. Mr. Stansbury successfully navigated the toll booth lane without swerving or making contact with any other vehicles or curbs. The lane violation was then called in to dispatch by Ms. Jones, as the radio in Ms. Booker's toll booth was not operating correctly.

Ms. Jones testified that she saw Ms. Ordone at Mr. Stansbury's vehicle trying to get him to move forward, then heard Ms. Ordone and Ms. Booker screaming "stop, stop, stop." She then heard Ms. Booker's bell go off so she knew the lane had been violated. Ms. Jones stated that while she did not get a good look at the driver, she did note that he was an elderly man with silver hair. From her vantage point, Mr. Stansbury appeared to be looking forward and not slumped over at all. With regard to the call she made to the Causeway police, Ms. Jones made the call as soon as Ms. Booker indicated her radio was not working, relaying Mr. Stansbury's license plate number to dispatch. Ms. Jones further noted as follows:

> I made the call out to central. Tell them there may be something wrong, because obviously he was at the beginning of the lane for a little bit. And then, when he passed through, he completely didn't heed to [any] advances to stop. He violated the lane. Just so the officer knows that there may be something wrong. May have a language barrier. It could be many things. Nervous. Don't know where they going. Or lost. You know, not sure. Because we had no contact. We can't see anything.
>
> . . . .
>
> A lot of times, people get confused. And they will stop at the lane, look around. See if there's a place for them to turn. Out of state people.
>
> You get people where they just, they are in a hurry, to get somewhere. But then, you will get problems. So when you say there may be something wrong with the driver, you just give the officer a heads up that we just had something that was just a little more unusual than just a lane runner occurred. So they can have their guard up, and be aware of any situation they are walking into.

Ms. Jones agreed that had the gate been lowered when Mr. Stansbury's vehicle was stopped in the lane, the gate would have hit the car. She noted further that even if the gate had been lowered, the gate would not have stopped Mr. Stansbury from entering the Causeway as it has a break away pin in it. Ms. Jones added that the toll booth operators have no authority to block or barricade vehicles on the Causeway.

When asked whether there was any physical way to prevent a vehicle from entering the Causeway, Ms. Jones replied no, and the following discussion occurred regarding the gate at each toll booth:

> Q. Okay. When you close your toll booth -- or let me ask you a better question. The gate that's in front of the booth, that goes down when?

> BY [COUNSEL FOR DEFENDANTS]:
> I'm going to object to the form, on the characterization of where the gate is located. But subject to that objection.

> BY [COUNSEL FOR MR. STRICKER]:
> Okay. Let me be clear.

> EXAMINATION BY [COUNSEL FOR MR. STRICKER]:

> Q. There's not a gate directly in front of the toll booth, correct?

> A. No, sir.

> Q. It's further at the beginning of the toll lane; is that a fair representation?

> A. Closer to the gantry, under the gantry.

> Q. Under the gantry. Okay. That gate under the gantry, how do you activate that gate?

> A. By a switch that is to the right of us in a lane. There's a procedure to doing that.

> Q. And what's that procedure?

> A. It's only when we need to close the lane down. So we would have to red light our lane first, to make sure no cars are entering at the time of the lowering of the gate. You cannot have any vehicles within the vicinity of that gate when you're lowering it. We can't take the risk of it actually hitting a vehicle.

10

Once you lower your gate, once it's completely lowered, then you log off your system to do shift change, break change, restroom breaks. [Or] if we get a call out to close the bridge, then we can.

Q. If you know an impaired driver, or you believe an impaired driver has entered the bridge, do you have the authority to try to close the bridge while the Causeway [P]olice deals with that driver?

A. No, sir. We do not close the bridge on our own recognizance. We have to make sure we have orders to do so.

Q. Okay. Can you request a bridge closure?

A. No, sir, we do not.

Q. The order to close a bridge, does that come through dispatch?

A. Either dispatch or the [Causeway Police] that is giving the order out will go over the radio.[3]

Robert Graham, Jr., an employee of the Causeway Commission since 1995 who is currently serving as its Director of Operations, testified as a corporate representative for the Causeway Commission. Mr. Graham stated that toll booth collectors do not have the authority or training to identify motorists who may be sick or intoxicated. Mr. Graham noted, "So, generally, all they can do is suspect. And so they're trained to use the phone or radio to notify and call [Causeway Police] to have it further checked out properly."[4] Mr. Graham noted that to the best of their ability, toll booth operators should screen vehicles coming onto the bridge for all aspects of potential safety. He added, however, that toll booth operators have no interaction with patrons who have toll tags on their vehicles, and they do not have the authority to detain anyone.

---

[3] Ms. Booker confirmed that toll booth operators are not allowed to close their gates without authority from dispatch.

[4] All three toll booth operators involved in this case testified that they never received any specific training concerning identifying impaired or incapacitated drivers as vehicles approach the toll booths. However, they explained that if they do have a suspicion about a particular driver, the general practice is to employ delay tactics and to utilize the turnaround near the toll booths, which allows the Causeway Police time to make it to their location and further investigate the situation.

Concerning the Causeway Commission's decisions about where to station its resources on the bridge, Mr. Graham indicated that they generally have police presence at the North Toll Plaza, as this is where the Causeway Police are stationed.[5] When asked if he thought it would be "the best safety policy" to have a police officer stationed at the North Toll Plaza at all times, Mr. Graham responded,

> Generally, they try to use their manpower out on the bridge where things are happening ... so you can respond. If something happens, you can respond to different locations quicker than if you're stationed at the end of the bridge and something happens in the middle. So we generally try to keep our people on the bridge, that would be closer, a quicker response time to an emergency.

Mr. Graham was not aware that on the day of the accident in question, there was not a police officer at the North Toll Plaza.

Also testifying on behalf of the Causeway Commission was Lieutenant Michael Kelly, a 23-year employee of the Causeway Police Department. Lieutenant Kelly had most recently been promoted to lieutenant over field services and was responsible for purchase orders, communications, internal affairs, water rescue training, and anything else the commander may assign to him. Lieutenant Kelly explained that the number of officers on duty during a typical shift changes depending on the "time of day, shift needs, holidays." He noted that on the day of the accident, a typical shift would have been four officers, including a sergeant, a corporal, and two officers. Lieutenant Kelly added that it is within the discretion of the shift sergeant as to where on the bridge he assigns the officers to help with traffic flow and that the shift sergeant can adjust accordingly, depending on problems that arise, the time of the day, or any weather-related issues. When the shift sergeant is on duty, he "roams" the 24-mile bridge as he is not assigned to any specific area.

---

[5] The North Toll Plaza was described as the area right next to the toll booths where the turnaround is located. Within the building located at the North Toll Plaza, there is an administrative area for the receptionist, the toll captain's office, and a "counting room."

Lieutenant Kelly confirmed that the Causeway Police do not provide any training to toll booth operators with regard to recognizing impaired drivers. He also stated that toll booth operators have to ask a supervisor or someone with rank on the bridge for permission before they can drop the gate in their lane, noting that the gates have breakaways and are not meant to stop cars from entering the bridge. Lieutenant Kelly added, "[t]hey'd pop right through it."[6]

On the day of this incident, Sergeant Tristan Thomas was the shift sergeant. Also working the shift in question were Officers Colt Bruhl, who was assigned "at large," Jason Bourne, who was assigned to the South, and Christian Coyle, who was assigned to the North.[7] When the call came in from Ms. Jones about the lane violation, Officer Coyle advised that he was in Crossover 1000, which is approximately three miles from the toll booth; there is no crossover between where Officer Coyle was and the toll booth. Officer Coyle stood by and waited for the vehicle to come towards his location. The accident occurred before Mr. Stansbury reached the location where Officer Coyle was stationed. Sergeant Thomas, who was traveling northbound when the call came in, was first on the scene. According to the record, the call about the accident came into dispatch at 9:11 a.m. Sergeant Thomas arrived on the scene between 9:12 a.m. and 9:13 a.m. The bridge was closed at 9:15 am.

Lieutenant Kelly testified that under no circumstances should Officer Coyle have turned northbound against traffic into the southbound lane to "intercept" the vehicle. He believed that the officers acted appropriately and that there was nothing they could have done differently to change the outcome. Officer Coyle chose not to issue a citation to Mr. Stansbury "due to his medical condition at the

---

[6] Mr. Graham also testified that toll booth operators do not have the ability to initiate the closure of the bridge; that decision is left up to the Causeway Police depending on what is happening on the bridge.

[7] There was also someone working the motorist assistance patrol truck on the day of the accident.

13

time of the crash." When pressed on whether the Causeway Commission had a policy to "just allow impaired drivers on the bridge," Lieutenant Kelly replied, "There's a north and a southbound bridge, you know. I mean, it's an open roadway in a sense. You know, nobody is monitoring the northbound traffic, so anybody can get on the bridge just like anybody can drive the roadway." He clarified his testimony, noting that while the Causeway Police "monitor" all of the bridge, motorists getting on the southbound bridge are "loosely observed." Lieutenant Kelly added further that if a toll booth operator suspects that a driver is impaired in anyway, they are trained to call the Causeway Police, as the "officers are on active patrol looking for the same things."

Mr. Stricker testified that he was on his way to work on the morning of the accident. As he was approaching the toll tag lane of the Causeway, a vehicle caught his eye as it was stopped some distance from the toll booth. He observed someone walking towards the vehicle, gesturing for the vehicle to move forward. The vehicle started creeping forward, and as Mr. Stricker was going through the toll tag lane, he was able to look over to see an older gentleman in the vehicle. Mr. Stricker noted that "something wasn't right" but he assumed the Causeway Police "would have been on it." He drove forward, glanced in the rearview mirror to see what was going on, and settled in for his drive to work. The next thing he remembered was a big flash and his arm was on the cement. He had only been on the bridge for approximately three miles at the time of impact.

Mr. Stricker testified that although Mr. Stansbury was behind him when he entered the bridge, he was still able to see Mr. Stansbury in his vehicle. Mr. Stricker described Mr. Stansbury as catatonic, locked up, stiff, and not natural looking. He acknowledged that because he was in a tag only lane, he never had to stop, adding that he probably had to look back after he cleared the toll booth to see

Mr. Stansbury. Mr. Stricker stated he was able to see "partially through his side window," noting that it was a "glance."

Mr. Stricker and Mr. Stansbury shared an ambulance to the hospital after the accident. According to Mr. Stricker, Mr. Stansbury required glucose to elevate his blood sugar. Once at the hospital, Officer Coyle spoke with Mr. Stansbury who indicated he was on his way to breakfast and had no idea how he ended up on the Causeway.

After our *de novo* review of the evidence submitted by defendants in support of their motion for summary judgment, we find defendants met their initial burden of showing an absence of factual support for the duty element of Mr. Stricker's claim. As such, the burden shifted to Mr. Stricker to establish the existence of a genuine issue of material fact or that defendants were not entitled to judgment as a matter of law. See La. Code Civ. P. art 966(D)(1); see also **Bruno v. Blue Bayou Water Park, LLC**, 2023-0675 (La.App. 1 Cir. 12/29/23), 381 So.3d 802, 809-810. Mr. Stricker attempted to meet this burden by filing an opposition to defendants' motion for summary judgment, together with numerous exhibits, including many of the same depositions submitted by defendants, a copy of the accident report, and a copy of the Causeway Commission's mission statement and the "toll plaza rules," taken from their website, as support for his argument that the Causeway Commission had assumed a clear and specific legal duty to monitor drivers and vehicles entering the Causeway to ensure the safety of the public crossing the bridge.[8]

---

[8] Moreover, as previously discussed, Mr. Stricker later filed his own cross motion for partial summary judgment on liability, arguing that the Causeway Commission made a promise to the public that its employees would monitor drivers and vehicles as they entered the Causeway through the North Toll Plaza and that this promise created a binding legal duty upon the Causeway Commission and its employees. Mr. Stricker alleged that the Causeway Commission could not escape liability because the duty was breached. The evidence submitted by Mr. Stricker in support of this cross motion and by defendants in opposition to the motion was virtually identical to the evidence that had initially been submitted by the parties in connection with defendants' motion for summary judgment.

15

According to the statement as found on the Causeway Commission's website, part of their mission is to "promote safe and efficient vehicular travel upon the Lake Pontchartrain Causeway and other highways and bridges within the jurisdiction of the department." Moreover, the "toll plaza rules" cited to by Mr. Stricker provide that all vehicles "must come to a complete stop at the toll booths between 8 p.m. and 5 a.m." and that "[m]ontoring of drivers and vehicles prior to entering the bridges will help insure your safety while crossing the Causeway."[9] Moreover, the rules provide that while the Causeway Commission is "committed to minimizing the time required to move through the toll plaza ... safety must remain paramount."

On appeal, Mr. Stricker argues that the mission statement, the "toll plaza rules," and the testimony of the Causeway Commission's corporate representatives, who both agreed that the role of the Causeway Commission is to keep the motorists on the Causeway as safe as possible, "demonstrate unequivocally" that the Causeway Commission assumed both the legal duty to protect motorists on the Causeway and the role of gatekeeper for the Causeway, at least for vehicles entering the southbound bridge. We find no merit to Mr. Stricker's argument.

As noted by defendants in brief to this court, Mr. Stricker refers to this duty as a "blanket of protection" from any potential accident on the Causeway that the Causeway Commission offers and must provide to all motorists. However, as correctly pointed out by defendants, Mr. Stricker neither offers support for this "strained" theory on duty nor submits any "specific acts of negligence or breaches of duty in any actions of the employees [of the Causeway Commission] to support such a breach or that such a breach was a cause in fact of the damages.". We agree

---

[9] Although we ultimately conclude the Causeway Commission owes no duty to Mr. Stricker, we note that the "toll plaza rules" cited to by Mr. Stricker have no application to this case as the accident in question did not occur between the hours of 8 p.m. and 5 a.m.

16

with defendants that Mr. Stricker has failed to identify any disputed factual issues as to duty.

After considering all of the evidence submitted by the parties below and hearing arguments of counsel, the trial court granted defendants' motion for summary judgment, denied Mr. Stricker's cross motion for summary judgment, and dismissed, with prejudice, all of Mr. Stricker's claims against defendants. Ruling from the bench, the trial court stated it would be "hard-pressed to find that there's a duty to monitor every entering driver for any possible medical emergency that may occur within two or three miles of the tollbooth." The trial court noted further that the duty did not extend as far as Mr. Stricker was asking that it be extended. Moreover, the trial court concluded that even if there was a duty owed by the Causeway Commission or its employees, there was no breach of said duty because the actions taken were appropriate under the circumstances. We agree.

The evidence in this case supports the trial court's finding that there was no duty imposed on defendants to prevent an accident such as the one before us. Notwithstanding that the Causeway Commission's mission is to "promote safe and efficient vehicular travel" across the Causeway, it is illogical to argue that this mission creates a duty on defendants to prevent every potentially impaired or incapacitated driver from entering the Causeway or to prevent accidents from occurring due to third-party negligence. As correctly noted by defendants in brief to this court, "[d]espite [Mr. Stricker's] overly broad argument to the contrary, Louisiana law does not and should not recognize any public entity as having such a 'gatekeeper' duty to anticipate and prevent third party accidents."

The evidence shows that Mr. Stansbury ignored verbal instructions and signage to stop at the North Toll Plaza, entered the southbound bridge, and drove for over two miles before the accident. Defendants had no direct interaction with Mr. Stansbury prior to him driving onto the Causeway. Moreover, given Mr.

Stansbury's alleged condition, there is no evidence or testimony in the record to support a finding that had any employees of the Causeway Commission acted differently, the outcome would have been any different. Like the trial court, we find that based on the facts and circumstances of this case, defendants acted appropriately.

On our *de novo* review of the record, we find that defendants were entitled to summary judgment as a matter of law and that Mr. Stricker's cross motion for summary judgment was properly denied. Mr. Stricker's assignment of error regarding duty is without merit, and we pretermit all other issues raised by Mr. Stricker on appeal.

## CONCLUSION

For the above and foregoing reasons, we affirm the trial court's October 26, 2023 judgment, granting summary judgment in favor of the Greater New Orleans Expressway Commission, AIX Specialty Insurance Company, and Sergeant Tristan Thomas; denying Charles Stricker's cross motion for summary judgment; and dismissing, with prejudice, all claims filed by Charles Stricker against the Greater New Orleans Expressway Commission, AIX Specialty Insurance Company, and Sergeant Tristan Thomas. We assess all costs associated with this appeal against plaintiff/appellant, Charles Stricker.

**AFFIRMED.**